UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

CHARLENE JOHNSON,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      CIVIL NO.  3:14cv1765
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Disability
Insurance Benefits and Supplemental Security Income  as provided for in the Social Security Act.
42 U.S.C. § 401 *et seq*.  Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s part of his answer,
the [Commissioner] shall file a certified copy of the transcript of the record including the
evidence upon which the findings and decision complained of are based.  The court shall have
the power to enter, upon the pleadings and transcript of the record, a judgment affirming,
modifying, or reversing the decision of the [Commissioner], with or without remanding the case
for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if
supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g). The law
provides that an applicant for disability insurance benefits must establish an "inability to engage
in any substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to last for a continuous period of not less than 12 months. . .
."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an
impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2.   The claimant has not engaged in substantial gainful activity since February 23, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.	The claimant has the following severe impairments: status-post right ankle fusion with residuals; arthritis of the left ankle; disc herniation at L5-S1; obesity; and asthma (20 CFR 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), as the claimant can lift and carry 10 pounds occasionally and frequently; stand and/or walk for 1 hour in an 8-hour workday; and sit for 7 hours in an 8-hour workday. The claimant must be able to alternate between positions every 30 minutes. The claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid unprotected heights; and can have only occasional exposure to inherently dangerous machinery. The claimant can have occasional exposure to extreme heat and cold; and no concentrated exposure to fumes, odors, dust, gases or poorly ventilated areas.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.	The claimant was born on February 9, 1974 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.	The claimant has not been under a disability, as defined in the Social Security Act,

from February 23, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-23).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on April 6, 2015. On July 13, 2015, the defendant filed a memorandum in support of the Commissioner's decision, and on July 27, 2014, Plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed applications for SSD and SSI on October 15, 2010, alleging disability beginning February 23, 2008. (Dkt. 15 at 141-146; 147-153) The Disability Determination Bureau (DDB) denied the Plaintiff's claims on February 3, 2011. *Id*. at 93-96; 97-100. Plaintiff requested reconsideration, but the DDB again denied the Plaintiff on July 21, 2011. *Id*. at 102-104; 105-107. Plaintiff filed a request for an administrative hearing on September 2, 2011. *Id*. at 108-110. On November 16, 2012, Plaintiff appeared for a hearing in Valparaiso, IN before ALJ Mark Naggi of the Valparaiso, IN Office of Disability Adjudication and Review (ODAR). Id. at 29-88. On March 7, 2013, ALJ Naggi issued an unfavorable decision, concluding the Plaintiff's impairments permitted the performance of other work. *Id*. at 9-27. Plaintiff filed a request for review by the Appeals Council of the Office of Disability Adjudication and Review, but the Appeals Council denied her request on May 30, 2014. *Id*. at 1-6. Plaintiff then timely filed a complaint with the United States District Court for the Northern District of Indiana.

Plaintiff was born on February 9, 1974. At the time of her administrative hearing, she was 38 years of age. *Id.* at 165. Plaintiff completed one year of college, and has previously worked as a cashier and a housekeeper. *Id.* at 170.

The record first documents Plaintiff's treatment for severe foot pain in early 2008. On February 23, 2008, Plaintiff presented to the emergency room with complaints of severe right ankle pain after sustaining a fall. *Id.* at 211. Imaging performed while at the ER revealed an oblique displaced fracture at the distal fibula, a transverse minimally displaced fracture of the medial malleolus, and a small plantar calcaneal spur. *Id.* at 220. On March 3, 2008, Plaintiff underwent an open reduction and internal fixation of her right ankle fracture. *Id.* at 257. In September of 2008, Plaintiff presented to Dr. Thomas Barbour for a consultative physical

examination. *Id.* at 262. She reported that "[s]he cannot stand for more than just a few minutes and this has interfered with her work and also her activities at home." *Id.* On examination, Dr. Barbour documented that the Plaintiff "walks with a wide based gait. She had a right leg limp favoring the right ankle. She had mild difficulty getting on and off the examination table due to the right ankle pain." *Id.* He observed trace pitting edema and limited range of motion in the right ankle, an inability to walk on the heels or toes of the right foot, and an inability to squat. *Id.* The examiner diagnosed "[c]hronic right ankle pain after an injury." *Id.* at 263.

Plaintiff presented to Dr. Michael Salcedo for a podiatry consultation on October 16, 2008 and complained of persistent pain and tenderness in her right ankle. *Id.* at 305. After being diagnosed with ankle joints synovitis with painful residual hardware, the Plaintiff underwent a arthroscopy and synovectomy with removal of residual hardware. *Id.* at 307-308. Dr. Salcedo observed "extremely large amounts of chronic synovitis both in the anteromeidal and anterolateral and anterior aspects of the ankle joint." *Id.* at 308. At a follow up in November, Plaintiff reported that she was "in a lot of pain this week and that she has been on her feet a lot" because of her ill father. *Id.* at 632. Dr. Salcedo observed nonpitting edema in the right ankle joint. *Id.* He discussed "the importance of staying off of her foot, to keep it elevated, nonweightbearing (using crutches)." *Id.* at 633. He ordered an x-ray, which showed interval removal of the hardware from the fixation but demonstrated a small screw within the distal right fibula as well as calcaneal spurs along the plantar aspect. *Id.* at 304. At a physical therapy consultation later in November, Plaintiff exhibited diminished strength with plantar flexion and was instructed on how to "utilize crutches appropriately." *Id.* at 628. During a podiatry follow up in early December, she reported that her pain "significantly reduced" and indicated she was "using her crutches to aid in

ambulation." *Id.* at 618. The Plaintiff was encouraged to transition off of her crutches. *Id.*

Plaintiff continued to present for podiatry consultations throughout the first half of 2009. In January, she reported "a great decrease in symptoms" and indicated she was back to "her previous level of activity." *Id.* at 606. Nevertheless, Dr. Salcedo observed pain with motion in the right ankle. *Id.* In February, Plaintiff reported attending physical therapy and being able to ambulate without pain. *Id.* at 598. Dr. Salcedo noted that she "no longer complains of pain in the area but states that once in a while, she will feel a pop that is not painful." *Id.* During a follow up in March, the Plaintiff reported she is "no longer experiencing pain in the ankle with the exception of changes in the weather: She can still feel a moderate discomfort." *Id.* at 595.

On April 16, 2009, Plaintiff presented to Dr. Thuy Ho for a podiatry consultation and complained of right ankle pain ("Pain is 5/10 and occurs w/ activity"). *Id.* at 586. Dr. Ho observed: "Calcaneal valgus foot type w/WB. Decreased rom of AJ DF w/ knees extended & flexed. Pain to palpation along PT tendon, rt. B/l medial arch collapse. Single heel rise demonstrates pain and weakness, but inversion of heel intact." *Id.* Dr. Ho diagnosed tendonitis and equinus deformity and applied "low-dye straps." *Id.* at 587. A week later, the Plaintiff indicated the "taping of feet" provided "great relief" and asked for prefabricated orthotics. *Id.* at 584. She indicated she was "willing to pay if not covered through Medicaid." *Id.* An examination revealed the same abnormalities as the examination from the week beforehand. *Id.* In May the Plaintiff reported that she "[n]o longer has arch pain" with her orthotics but described "some discomfort . . . at leading edge of orthotic." *Id.* at 582. An examination showed persistent abnormalities. *Id.* Plaintiff weighed 296 pounds in September of 2009, and was diagnosed with morbid obesity. *Id.* at 580.

In 2010, Plaintiff began experiencing recurring ankle pain. On June 10, 2010, Dr. Larson, one of Plaintiff's treating podiatrists, wrote a note indicating: Please excuse this patient from work: From 06/10/2010-07/01/2010. This patient may return with the following restrictions: sit down job only, Must wear CAM boot." *Id.* at 554. At a podiatry consultation four days later, Plaintiff complained of recurring pain after recently twisting her right foot and ankle. *Id.* at 552. She described pain in the anterior aspect of the ankle joint (5/10) and at the right plantar medial arch ("constant 10/10"). *Id.* Plaintiff reported her pain and swelling decreased with elevation and icing, but worsened with ambulation and weight bearing. *Id.* at 552. Dr. Larsen noted positive edema of the right medial and lateral ankle, "calcaneal valgus foot type w/ WB," "Decreased rom of AJ DF w/ knees extended & flexed," pain to palpation along the PT tendon, anterior ankle joint, and right plantar medial arch, and evidence of bilateral medial arch collapse. *Id.* He performed an ultrasound, which showed a slightly inflamed, thickened plantar fascia at "the area of concern." *Id.* at 553. Dr. Larsen instructed Plaintiff to return in two weeks and to wear her CAM boot during all ambulation. *Id.* at 553.

On July 6, 2010, Plaintiff presented with reports that "her pain on the R side is a little better, but mostly because she is using more of her L foot and now the L foot is hurting also. She states the swelling went down after she had elevated and iced her foot for a few days and was taking Advil. She states it was worsened with ambulation and weight-bearing." *Id.* at 544. Dr. Bui documented edema of the bilateral medial and lateral ankles, "calcaneal valgus foot type w/ WB," "Decreased rom of AJ DF w/ knees extended & flexed," "Pain to palpation along PT tendon b/l, anterior ankle joint, and plantar medial arch rt. B/l medial arch collapse." *Id.* Dr. Bui diagnosed foot tendonitis, acquired equinus foot deformity, limb pain, calcaneovalgus foot deformity, right

plantar fascia tear, and bilateral PT tendonitis. *Id.* at 544-545. Dr. Bui instructed the Plaintiff to "reduce the time she spent on her foot to a minimum and rest her foot as much as possible." *Id.* In August the Plaintiff indicated she "is feeling much better at this time but just continues to have some tenderness in her medial ankle, right. . . Pt. wearing CAM boots for longer walks, regular shoes for short distances." *Id.* at 541.

During September, Plaintiff reporting doing well because "the plantar fasciitis pain is gone," but described persistent tenderness in her right ankle and stated, "couple days ago she fe[lt] a pop in her R ankle it is mildly painful and does have some swe[l]ling associated with it." *Id.* at 538. Dr. Bui chose to order an x-ray due to the recent report of trauma. *Id.* at 539. Performed on September 13th, the x-ray revealed "prominent" bilateral calcaneal spurs, bilateral pes planus deformities with weight bearing, and retained orthopedic hardware within the distal right fibular consistent with an old fracture. *Id.* at 464. On September 20, 2010, Plaintiff presented to Dr. Duyet Bui with complaints of right plantar medial arch pain, bilateral PT tendonitis, and right medial ankle tenderness. *Id.* at 534. Dr. Bui noted positive edema of the right medial and lateral ankle, as well as "Calcaneal valgus foot type w/ WB. Decreased rom of AJ DF w/ knees extended and flexed. Pain to palpation along PT tendon b/l, anterior ankle joint, and plantar medial arch rt. B/l medial arch collapse." *Id.* at 535. Dr. Bui diagnosed neuropraxia, foot tendonitis, acquired equinus foot deformity, limb pain, calcaneovalgus deformity of foot, bilateral PT tendonitis, and ankle pain. *Id.* at 535-536. Dr. Bui included in Plaintiff's plan to continue supportive shoe gear, perform stretching exercises three times daily, and to return in eight weeks. *Id.* at 536. He also discussed how the Plaintiff's weight affected her foot pain. *Id.*

On November 29, 2010, Plaintiff returned to Dr. Bui with complaints of worsening foot

and ankle pain. *Id.* at 698. Dr. Bui noted limited ROM of the bilateral lower extremities; decreased foot arch height; out-toe upon ambulation; pain on palpation of the course of the peroneal tendon bilaterally, especially at the fibular groove down the cuboid; generalized diffuse pain on ROM of ankle/STJ/CC joints; pain on palpation of sinus tarsal; and pain on palpation of TP tendon and its insertion. *Id.* at 700. Dr. Bui diagnosed acquired equinus deformity of the foot, calcaneovalgus talipes, peroneal tendonitis, and limb pain. Dr. Bui performed an ultrasound on Plaintiff's right foot in office, which showed mild edema surrounding the peroneal longus at the peroneal groove. *Id* The physician administered an injection for pain reduction. *Id.*

Plaintiff underwent imaging of her right foot on December 17, 2010 due to persistent pain. *Id.* at 731. The imaging showed intermetatarsal bursitis of the first web space and hallux valgus deformity. *Id.* at 732. An MRI of Plaintiff's right ankle performed a few days later revealed mild degenerative changes of the tibiotalar joint with mild anterior osteophyte, mild nonspecific subcutaneous edema noted laterally and to a lesser extent medially, fatty atrophy of the abductor digit minimi muscle which may be secondary to remote denervation (Baxter's neuropathy), and heel spur. *Id.* at 726. Dr. Bui also ordered an MRI of Plaintiff's left ankle performed that same day, which revealed fatty atrophy of the abductor digiti minimi muscle, likely secondary to remote denervation/Baxter's neuropathy; mild subcutaneous edema at the lateral aspect of the ankle; and thickening of the anterior talofibular ligament. *Id.* at 729.

On January 22, 2011, Plaintiff presented to Dr. Mahmoud Yassin Kassab for a physical examination at the request of the DDB. *Id.* at 705. Plaintiff complained of severe right ankle pain, which worsened by standing and walking on the foot and which was relieved by keeping her leg elevated and taking pain medication. She further reported being able to slowly walk one block

and slowly climb one flight of stairs with pain. *Id.* Dr. Kassab noted swelling of the right ankle, a mild antalgic gait on the right side, and limited motion in the right ankle. He diagnosed right ankle pain status post reconstructive surgery. *Id.* at 706.

On May 25, 2011, Plaintiff presented to Dr. Michael Salcedo with complaints of generalized foot and ankle pain. *Id.* at 738. Dr. Salcedo noted "Pt is now using a walker to get around because of B/L foot pain. She has reduced her activity level to the point where the only exercise that she is getting is walking her daughter from the bus stop which is only six houses down the road." *Id.* Dr. Salcedo noted limited bilateral ankle range of motion, pain on ROM significantly on the right with edema, and pain on palpation of the anterior aspect of the ankle joint. *Id.* at 740. Dr. Salcedo recorded in his plan "Discussed the surgical options of fusion vs ankle scope with the pt… Pt understands that this may bring incomplete resolution of pain but could buy her time till a fusion should be performed." *Id.* at 741. Later that same day of May 25, 2011, Plaintiff presented to Dr. Michael Salcedo for a right ankle arthroscopy with synovectomy and anterior tibial distal debridement. *Id.* at 734. Dr. Salcedo observed "extensive synovitic as well as scarring anterior impingement that did impinge with the dorsiflexion of the ankle joint" as well as "prominent anterior distal tibial lifting." *Id.* at 735.

Plaintiff underwent another x-ray of her right foot on September 1, 2011 due to persistent pain. *Id.* at 858. This study showed minimal flattening of the arch, plantar calacaneal spur, and hallux valgus deformity. *Id.* at 858. On November 4, 2011, Plaintiff presented to Dr. Michael Salcedo for a right ankle arthrodesis, due to her pre-op diagnosis of right ankle osteoarthritis. *Id.* at 840. On November 9, 2011, a treating physician prescribed a "wheelchair and rollabout walker" and instructed the Plaintiff "to elevate as much as possible." *Id.* at 937. X-ray imaging of

11

the Plaintiff's right ankle taken on December 26, 2011 showed increased callus formation at the distal fibular osteotomy site. *Id.* at 817.

On February 16, 2012, Plaintiff presented to Physical Therapist Mary Harvey for her initial evaluation, ordered by Dr. Cassandra Papak. *Id.* at 800. Plaintiff complained of constant pain on the lateral ankle, posterior ankle in the Achilles area, as well as on the medial aspect of the right ankle, all rated at 8-9/10; numbness in the distal foot; and intermittent daily sharp stabbing pains in the foot. *Id.* Ms. Harvey recorded Plaintiff's stated goal of "To be able to walk without a walker with her special shoe." Ms. Harvey noted several abnormalities in Plaintiff's ambulation, including an externally rotated right foot with weight bearing on the lateral aspect of the foot, decreased hip extension during gait, and use of a rolling walker with a step two gait pattern with hip drop on the left and lack of heel stroke or push off gait pattern. *Id.* Range of motion showed moderate limitations in hip extension bilaterally and neutral dorsiflexion on the right. Decreased strength was observed at the bilateral hip flexors, hip abductors, hip extensors, quads, hamstrings, dorsiflexors, and plantarflexors. *Id.* With palpation, Plaintiff complained of tenderness along the medial and lateral surgical scars and the muscle belly of the peroneal muscles on the right with accompanied muscle spasm. *Id.* Ms. Harvey noted, "Major problem area is pain and inability to walk long distances due to increasing pain. Patient also has weakness in the lower extremities bilaterally with greater weakness on the right." *Id.* at 801. The therapist set a goal of getting the clamant to "walk without a walker." *Id.*

X-ray imaging of the right ankle on February 16, 2012 showed joint space loss present at the mortise level superiorly and laterally, plantar calcaneal spurring, and "no definite solid bony union" of the fibula. *Id.* at 815. At a visit with Dr. Julia Pagano on February 22, 2012, Plaintiff

received instructions to keep her right ankle elevated and a prescription for Gabapentin. *Id.* at

911. Plaintiff underwent a CT scan of her right ankle on March 7, 2012 due to persistent pain in

the right ankle. *Id.* at 797. The images revealed a fracture osteotomy site, a nonunion with callus

formation ("no evidence for bony fusion"), small fragments of bone seen within the distal fibula-

tibia joint and posteriorly at the level of the distal fibula-talus joint, and partial fusion of the fibula

with the distal tibia and talus. *Id.*

Plaintiff returned to Dr. Cassandra Papak for a follow up on March 21, 2012 with

complaints of "pins and needles" feeling in her feet. *Id.* at 905. Dr. Papak recorded Plaintiff's use

of an assistive walker as well as mild pain to palpation on the lateral right ankle. *Id.* Dr. Papak

noted in her summary that "Patient encouraged to continue elevating right ankle and may apply

ice PRN." *Id.* She also increased Plaintiff's Gabapentin dose, elongated her physical therapy

regimen, and dispensed a new pair of custom orthotics. *Id.* at 907. On April 27, 2012, Plaintiff

presented to Dr. Amer Kazi for a consultation regarding her foot pain. *Id.* at 879. Plaintiff

complained of ankle and foot pain with burning and tingling in her right foot and big toe that

radiated up to the ankle. She stated exacerbating factors of walking and standing, and described

no relieving factors. *Id.* Dr. Kazi observed a broad-based and antalgic gait, as well as bilateral

lumbosacral tenderness, positive right sided straight leg raise (SLR) test at 60 degrees, positive

Patrick's tests bilaterally, bilateral tenderness at the knee joints, ankle tenderness, mild swelling

of the ankle extending up the leg, positive Tinel's sign at the dorsum of the foot, reduced

sensation at the dorsum of the right foot in the first interdigital space, an absent right ankle jerk

reflex, and hypoactive left ankle jerk reflex. *Id.* at 881. Dr. Kazi diagnosed back pain, lumbar or

lumbosacral intervertebral disc degeneration, osteoarthrosis, pain radiating to right leg, and joint

pain involving the ankle and foot. *Id.* Dr. Kazi ordered imaging of the lumbar spine and bilateral knees, as well as prescriptions for Nucynta, Lidoderm patches, and Mobic. He noted that "Her pain in the ankle and foot appears to be multifactorial related degenerative changes and postop changes. She does have neuralgiform pain in her medial side of her foot which could have been caused by scarring after the surgery… I also feel that her pain in the leg and back is related to DDD." *Id.* at 882.

On May 25, 2012, Plaintiff presented for an MRI of her lumbar spine. *Id.* at 883. The imaging showed mild facet degenerative changes and ligamentum flavum thickening at L4-L5; as well as facet degenerative changes at L5-S1 with a central to right paracentral disc herniation contacting the traversing right S1 nerve root. *Id.* On May 29, 2012, Plaintiff underwent x-ray imaging of her bilateral knees, ordered by Dr. Kazi due to a history of foot, knee, and back pain. *Id.* at 795. The imaging showed mild arthritic changes. *Id.*

Plaintiff presented to Dr. Steven Moore on September 26, 2012 with complaints of painful left ankle and foot pain. *Id.* at 894. Dr. Moore noted minimal pain with palpation of the medial gutter of the ankle joint and decreased right ankle joint ROM. *Id.* at 895. Dr. Moore diagnosed ankle pain, primary localized osteoarthrosis of the ankle and foot, and acquired cavovarus foot deformity. He administered an injection to Plaintiff's left ankle in office, ordered x-ray imaging, and prescribed Naproxen. *Id.* at 896-897. On October 16, 2012, Plaintiff returned to Dr. Moore and indicated that Naproxen failed to alleviate her pain. She complained of a painful left ankle as well as increased knee and back pain. *Id.* at 890. Dr. Moore ordered a pain management consultation. *Id.* at 892. On November 2, 2012, Plaintiff presented to Dr. Karina Zapiecki with complaints of pain in the right ankle, right knee, and lower back. *Id.* at 885. Dr. Zapiecki noted

tenderness to palpation of the spine in the lower back area and pain with palpation of the right foot/ankle. *Id.* He diagnosed morbid obesity and noted the Plaintiff "has to increase her exercise which will be difficult for her due to her left knee pain and also right ankle pain." *Id.* at 886.

On January 10, 2013, Plaintiff presented to Dr. Ralph Inabnit for a physical consultative examination at the request of the DDB. *Id.* at 968. Dr. Inabnit noted that Plaintiff presented to the exam using a walker, and had a history of four procedures on her right ankle. *Id.* Plaintiff complained of chronic bilateral ankle pain; bilateral knee pain; and issues with walking, standing, sitting, lifting, and climbing. *Id.* She indicated she "uses a walker to walk" but "can walk without the walker a few steps." *Id.* On examination, Dr. Inabnit observed decreased breath sounds, mild prolongation of the expiratory phase, expiratory wheezes heard throughout, pain in the joint on the medial and lateral compartment of the right and left ankle, a "slow and purposeful" gait, 1/5 reflexes bilaterally of the upper extremities and knee jerks, 0/5 bilateral ankle jerk reflex, and no motion at all in the right ankle. *Id.* at 972-973. Dr. Inabnit wrote, "She is on a walker. She prefers to stand or sit for no more than 15-20 minutes and can lift 10 pounds." *Id.* at 973. Dr. Inabnit then completed a questionnaire and concluded she can occasionally lift and carry 20 pounds, sit, stand or walk for two hours at a time and for four total hours in an eight hour day, occasionally engage in reaching, handling, or fingering with both upper extremities, occasionally engage in foot controls with both feet, and occasionally climb stairs and ramps. *Id.* at 976-979. He opined that she does not need an assistive device to ambulate. *Id.* at 977.

On November 16, 2012, Plaintiff appeared for a hearing in Valparaiso, IN before ALJ Mark Naggi of the Valparaiso, IN Office of Disability Adjudication and Review (ODAR). *Id.* at 29-88. Plaintiff reported gaining weight after her right ankle fusion because "[t]hey had me in the

wheelchair." *Id.* at 40. She testified that she no longer drives because "I get the pains that shoot

up from my ankle." *Id.* at 41. She indicated she stopped working in 2008 after "I got out of work

that night and broke my ankle and from then on instead of it getting better it has gotten worse."

*Id.* at 44. Plaintiff testified that she cannot work because of "the pains I have that shooting [sic]

up my leg . . . sometimes there's the one that it burns, my whole ankle burns from the back and

it'll shoot up . . ." *Id.* at 47. She stated that doctors were considering operating on her left ankle

because "my leg gave out on me twice." *Id.* at 48. The Plaintiff reported difficulty sitting for

prolonged periods due to "a numbness I get." *Id.* at 49. She reported taking her walker

"everywhere I go" because "[i]ts; the only way I can hold myself up and get around." *Id.* at 60.

Plaintiff testified that she cannot mop or vacuum, and relies on her daughter to complete the

laundry. *Id.* at 61-62. She indicated she grocery shops but reported, "I just sit in the cart and [her

friend will] get all the stuff and put it in there and I'll just give them the card and that's it." *Id.* at

62. She explained that she sits "in the rider, the ride around cart." *Id.* Although Plaintiff admitted

going to church frequently to pray, she indicated "the pastor picks us up." *Id.* at 65.

     The vocational witness, Richard Fisher, then testified. After the witness described the

Plaintiff's past work, the ALJ asked him to consider a hypothetical individual with the same age,

education and work experience as the Plaintiff but physically capable of lifting 10 pounds, sitting

for seven hours with the ability to change positions every half hour, standing and walking for one

hour each, occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and

crawling, never climbing ladders and scaffolds, never working around unprotected heights,

occasionally working around inherently dangerous machinery or extreme temperatures, and

having no concentrated exposure to pulmonary irritants. *Id.* at 76-77. The witness testified that

such person could perform the positions of ampule sealer, telephone quote clerk, and order clerk. *Id.* at 76-78. The witness indicated a person would be unable to sustain work if they were off-task five minutes an hour or 10 percent of the workday. *Id.* at 79-80.

On March 7, 2013, ALJ Naggi issued an unfavorable decision. *Id.* at 9-27. At Step Two, the ALJ concluded that the Plaintiff suffers from the following severe impairments: status-post right ankle fusion with residuals; arthritis of the left ankle; disc herniation of L5-S1; obesity; and asthma. *Id.* at 14. He found that the Plaintiff's impairments of mild arthritis in the knees and hypertension to be non-severe impairments within the meaning of the Social Security Act. *Id.* at 15. At the first half of Step Three, the ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. *Id.* At the second half of Step Three, the ALJ found that the Plaintiff retained the capacity to sustain sedentary work as the Plaintiff can lift and/or carry 10 pounds occasionally and frequently; stand and/or walk for 1 hour in an 8-hour workday; and sit for 7 hours in an 8-hour workday. The Plaintiff must be able to alternate between positions every 30 minutes. The Plaintiff can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl. The Plaintiff must avoid unprotected heights; and can only have occasional exposure to inherently dangerous machinery. The Plaintiff can have occasional exposure to extreme heat and cold; and no concentrated exposure to fumes, odors, dust, gases or poorly ventilated areas. *Id.* at 16. At Step Four, the ALJ concluded the Plaintiff could not perform past relevant work of a retail sales clerk, fast food worker, and a hotel clerk. *Id.* at 21. At Step Five, the ALJ found that the Plaintiff could perform the following occupations: ampule scaler, telephone quote clerk, and a food and beverage order clerk. *Id.* at 22.

17

Plaintiff's claim for benefits was denied upon this Step Five finding. *Id.*

In support of reversal or remand of the Commissioner's decision, Plaintiff first argues that the Commissioner's finding that the Plaintiff's foot impairment or combined impairments do not meet or equal Listing 1.03 is not supported by substantial evidence and the relevant legal standards. At Step Three, the ALJ is required to determine whether the Plaintiff meets or equals any of the listed impairments found in 20 C.F.R. Pt. § 404, Subpt. P, Appendix 1. *Barnett v. Barnhart,* 381 F.3d 664, 670 (7th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(iii). For each listed impairment, there are objective medical findings and other specific requirements that must be met to satisfy the criteria of that Listing. 20 C.F.R. §§ 404.1525(c)(2)-(3), 416.925(c)(2)-(3). When a claimant satisfies all such criteria to meet a listed impairment, that person is deemed disabled and is automatically entitled to benefits. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(a), 416.925(a); 404.1525(c)(3) and 416.925(c)(3).

Even if a Plaintiff's impairment does not satisfy each of the specified elements of a Listed Impairment, it can result in a finding of disability if the record contains "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926; 20 C.F.R. § 404.1526; *Barnett*, 381 F.3d at 668 ("A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing."). Medical equivalence may also be found when the Plaintiff has a combination of impairments which do not individually meet a listed impairment, but are "at least of equal medical significance to those of a listed impairment" when viewed in totality. 20 C.F.R. §404.1526(b) (3) and 416.926(b) (3).

Listing 1.03 presumes disability for a claimant who undergoes "[r]econstructive surgery or

18

surgical arthrodesis of a major weight bearing joint with inability to ambulate effectively . . . and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 1.03. "Inability to ambulate effectively" is further defined as follows:

> An extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id.* at § 1.00B2b(1). The Listing goes on to explain that to ambulate effectively, a claimant "must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *Id.* at § 1.00B2b(2). An example of ineffective ambulation would be "the inability to walk without the use of a walker." *Id.* Moreover, "the ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

In the present case, Plaintiff presented evidence showing a history of surgery on her right ankle and demonstrating that she was using a walker to ambulate by May of 2011. (Tr. at 738 (Dr. Salcedo noting "Pt is now using a walker to get around because of B/L foot pain. She has reduced her activity level to the point where the only exercise that she is getting is walking her daughter from the bus stop which is only six houses down the road.")) Dr. Salcedo performed a right ankle arthroscopy with synovectomy and anterior tibial distal debridement. *Id.* at 734. He observed "extensive synovitic as well as scarring anterior impingement that did impinge with the dorsiflexion of the ankle joint" as well as "prominent anterior distal tibial lifting." *Id.* at 735. In

November of 2011, Dr. Salcedo performed a right ankle arthrodesis. *Id.* at 840. On November 9, 2011, another treating physician prescribed a "wheelchair and rollabout walker" and instructed the Plaintiff "to elevate as much as possible." *Id.* at 937.

Plaintiff also presented evidence demonstrating that she did not obtain effective ambulation within a year after her right ankle arthrodesis. In February of 2012, Plaintiff's physical therapist noted, "Major problem area is pain and inability to walk long distances due to increasing pain. Patient also has weakness in the lower extremities bilaterally with greater weakness on the right." *Id.* at 801. The therapist set a goal of getting the clamant to "walk without a walker." *Id.* Imaging later that month showed "no definite solid bony union" of the fibula and additional imaging performed in March a fracture osteotomy site, a nonunion with callus formation ("no evidence for bony fusion"), small fragments of bone seen within the distal fibula-tibia joint and posteriorly at the level of the distal fibula-talus joint, and partial fusion of the fibula with the distal tibia and talus. *Id.* at 815, 797. The Plaintiff's physician documented that she was using a walker in March of 2012. *Id.* at 905. When she met with Dr. Inabnit in January of 2013, she indicated she "uses a walker to walk" but "can walk without the walker a few steps." *Id.* at 968. Dr. Inabnit observed pain in the joint on the medial and lateral compartment of the right and left ankle, a "slow and purposeful" gait, 1/5 reflexes bilaterally of the upper extremities and knee jerks, 0/5 bilateral ankle jerk reflex, and no motion at all in the right ankle. *Id.* at 972-973.

In light of this evidence, Plaintiff argues that the ALJ erred by failing to adequately explain how the Plaintiff's right ankle impairment did not satisfy the criteria of Listing 1.03. The Seventh Circuit has emphasized, "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue,* 697 F.3d

642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

Reversing an ALJ's analysis of whether a Plaintiff's impairment met or equaled the relevant

listing, the court wrote:

> An unarticulated rationale for denying disability benefits generally requires
> remand. . . We have repeatedly held that an ALJ must provide a logical bridge
> between the evidence in the record and her conclusion.

*Id.* at 648 (citations omitted). Both the Seventh Circuit and this Court have reversed ALJ

determinations on the basis of a poorly articulated listing analysis. *Brindisi v. Barnhart*, 315 F.3d

783, 786 (7th Cir. 2003) (reversing findings which were "devoid of any analysis that would enable

meaningful review"); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)("By failing to discuss the

evidence in light of Listing 112.05's analytical framework, the ALJ has left this court with grave

reservations as to whether his factual assessment addressed adequately the criteria of the listing");

*Hiatt v. Colvin*, No. 11-cv-1282, 2013 U.S. Dist. LEXIS 4578 at 12-16 (S. D. Ind. March 29,

2013)("The ALJ also committed legal error by not sufficiently articulating her evaluation of the

evidence against the criteria of Listing 1.04(C) and by not explaining an accurate and logical

relationship between the evidence and her ultimate findings.")

This court agrees that the ALJ's analysis of the Plaintiff's ability to ambulate under the

criteria of Listing 1.03 does not provide substantial evidence for his unfavorable finding. He

acknowledged the evidence of an impaired gait and evidence of the Plaintiff's use of a walker in May

2011 but then wrote that "there is no prescription or any doctor recommending it." (Tr. at 15) Noting

evidence that she was using a walker in November of 2011, the ALJ again wrote that "there is still no

prescription or treating provider recommending it." *Id.* However, the ALJ's repeated factual assertion

is erroneous. Indeed, a treating physician prescribed a "wheelchair and rollabout walker" in

November of 2011. *Id.* at 937.  In any event, the ALJ erred by failing to obtain a reliable medical

opinion regarding whether her combined physical impairments equal the criteria of the listing. Whether a Plaintiff's impairment(s) equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue. *Barnett*, 381 F.3d at 670 (citing 20 C.F.R. § 404.1526(b)). Specifically, SSR 96-6p further provides that an adjudicator "must obtain an updated medical opinion" when she determines either "the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable" or when "additional medical evidence is received that . . . may change the State agency medical or psychological consultant's finding" regarding equivalence. *Simpson v. Colvin*, 2013 U.S. Dist. LEXIS 106894 at *16-17 (S.D. Ind. July 31, 2013). Thus, a remand is necessary on this point.

Plaintiff next argues that the Commissioner's finding that the Plaintiff can sustain work requiring her to stand or walk without ever using a walker is not supported by substantial evidence or the relevant legal standards. The ALJ disregarded the Plaintiff's allegations of a need to use a walker to ambulate due to foot pain by writing that "there is no record of any of her treating providers recommending it" and "there is again no prescription in the record." (Tr. at 20) However, an ALJ must consider all relevant medical evidence and cannot cherry-pick facts that support a finding of non-disability while ignoring evidence supporting disability. *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir.2009)). An adjudicator must confront the evidence that does not support his conclusion and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Kasarsky v. Barnhart,* 335 F.3d 539, 543 (7th Cir. 2003); *Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003). Clearly, the ALJ's credibility determination is flawed because he ignored evidence that a treating physician prescribed a "wheelchair and rollabout walker" in November of 2011. *Id.* at

937.

Additionally, the ALJ improperly relied on Dr. Inabnit's opinion that Plaintiff does not need an assistive device to ambulate and failed to explain why he rejected the portions of the physician's opinion which conflicted with his RFC assessment. The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). They also provide that an ALJ must weigh such opinions with consideration of whether they treated the Plaintiff, whether they examined the Plaintiff, whether they have "consider[ed] all the pertinent evidence," and whether the opinion is "consistent . . . with the record as a whole." *Id.* at § 404.1527(c)(1)-(4). Further, SSR 96-8p mandates that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." An ALJ is required to provide a logical and accurate bridge between the evidence and his conclusions in order to enable meaningful review. *Roddy*, 705 F.3d at 636. This court holds that, in the present case, the ALJ improperly relied on Dr. Inabnit's opinion that the Plaintiff does not need an assistive device without adequately weighing the physician's conclusion. The ALJ disregarded the consultative examiner's opinion about the Plaintiff's ability to stand and walk, thus the ALJ should not have relied on that same opinion to conclude the Plaintiff can ambulate without ever using an assistive device and did not exhibit an inability to ambulate effectively.

The ALJ also failed to explain why he rejected Dr. Inabnit's conclusions about the Plaintiff's manipulative limitations. While the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected. *Indoranto*, 374 F.3d at 474. Despite writing that Dr. Inabnit's conclusions are

"somewhat consistent with the record," the ALJ failed to explain why he disregarded the physician's conclusion that Plaintiff can only reach, handle, finger, feel, push, and pull on an occasional basis with both upper extremities. (Tr. at 21, 978). The ALJ failed to build a logical bridge between the evidence and his conclusion. Thus, remand is warranted on this point also.

Next, the Plaintiff asserts that the ALJ improperly rejected the Plaintiff's allegations of difficulty standing or walking without using a walker without offering a reasonable, supported rationale. In assigning a Residual Functional Capacity, the ALJ must consider the Plaintiff's testimony, the objective medical evidence, *and* opinions from medical sources. 20 C.F.R. § 404.1545(3). A court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004)). However, an ALJ does not possess unlimited discretion to reject a Plaintiff's testimony. When the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a Plaintiff's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. A court may reverse a credibility determination if it finds that the rationale provided is "unreasonable or unsupported." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006)).

In the present case, as noted above, the ALJ inaccurately concluded that no treating physician has ever recommended or prescribed the use of walker. The ALJ also wrote, "The claimant's daily activities, course of treatment, and work history are inconsistent with her allegations of disabling impairments." (Tr. at 19) Yet the ALJ failed to explain how any of the

24

activities the Plaintiff can perform undermine her allegations of difficulty walking or standing and a need for a walker to ambulate. *Id.* Indeed, he merely cited the fact that "her daughter does all of the chores and cooking" as well as the fact that "she uses a motorized cart and the grocery store and takes her walker everywhere." *Id.* These activities do not contradict the Plaintiff's allegations. Moreover, the Seventh Circuit has repeatedly explained that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [he] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-279 (7th Cir. 2013) (citations omitted); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Thus, the Plaintiff's limited daily activities do not provide the logical bridge to uphold the ALJ's decision to reject her allegations of difficulty standing or walking and a need for a walker.

The ALJ's discussion of the Plaintiff's "course of treatment" is even more problematic. The ALJ seemed to emphasize that the Plaintiff improved with treatment, but overlooked how she underwent multiple, aggressive surgeries in an effort to alleviate her severe foot pain. (Tr. at 19-20) As SSR 96-7p explains:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

The ALJ in this case erred by ignoring the Plaintiff's efforts to treat her foot pain supported her

allegations of a need for a walker to ambulate. Additionally, the mere fact that the Plaintiff experienced some improvement from treatment does not contradict her allegations of persistent symptoms. *See Scott v. Astrue*, 647 F.3d 734, 739-740 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce"). Thus, the Commissioner's adverse credibility determination is "patently wrong" and requires a remand. *Clifford*, 227 F.3d at 872.

*Conclusion*

On the basis of the foregoing, this matter is REMANDED to the Commissioner for further proceedings consistent with this opinion.


 Entered: August 28, 2015.


                                                       s/ William C.  Lee
                                                       William C. Lee, Judge
                                                       United States District Court